524 F.Supp. 1270 (1981)
MANHATTAN STATE CITIZENS' GROUP, INC., Plaintiff,
v.
James F. BASS, as President of the New York City Board of Elections; R. Wells Stout, as Chairman of the New York State Board of Elections; Hugh L. Carey, as Governor of the State of New York, Defendants.
No. 81 Civ. 5883 (GLG).
United States District Court, S. D. New York.
October 30, 1981.
New York Lawyers for the Public Interest, New York City, for plaintiff; Minna J. Kotkin, New York City, Lewis A. Golinker, New York City, of counsel.
Allen G. Schwartz, Corp. Counsel of the City of New York City, for defendant Bass; Susan M. Shapiro, Asst. Corp. Counsel, New York City, of counsel.
Robert Abrams, Atty. Gen. of N. Y., for defendants Stout and Carey; Daniel D. Kaplan, Asst. Atty. Gen., New York City, of counsel.

OPINION
GOETTEL, District Judge:
Under the New York Election Law, persons who have been adjudged incompetent, *1271 or are involuntarily committed to a mental institution by court order, lose their right to vote. N.Y. Election Law § 5-106(6) (McKinney 1978) ("section 5-106(6)"). Plaintiff Manhattan State Citizens' Group, Inc. ("Citizens' Group"), a not-for-profit corporation, some of whose members are involuntarily committed patients of the Manhattan Psychiatric Center ("Manhattan State"), challenge the constitutionality of this statute on the grounds that it violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution and the Constitution of the State of New York, and the suffrage provisions of Article II, Sections 1 and 3 of the New York Constitution. In its complaint, the plaintiff seeks a declaratory judgment, injunctive relief, and attorneys' fees. Because of the upcoming election, they have moved for a preliminary injunction restraining the defendants from enforcing this statute.
Named as defendants are the presidents of the New York City and New York State boards of elections and Hugh Carey, the Governor of New York. The state defendants have filed opposing papers and have cross-moved for summary judgment on the ground that the plaintiff lacks standing to prosecute this action. New York City takes a more passive approach. Its position is that it merely enforces the state election law and will comply with any order of this Court.

I. Standing

The Supreme Court set forth the criteria under which an organization may assert the claims of its individual members in Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). It noted that an organization has standing if
(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
Id. 432 U.S. at 343, 97 S.Ct. at 2441.
The only aspect of standing in dispute is whether the members of the Citizens' Group have standing to sue in their own right. The defendants contend that the plaintiff lacks standing because it failed to demonstrate that its members would be otherwise qualified to vote in the absence of the challenged provision, that is, that it has members who are United States citizens of at least eighteen years of age who are residents of the State, County, and City of New York, who have been involuntarily committed by court order and who have not been adjudged incompetent, and who are not precluded from voting by reason of having been convicted of a felony. Although the plaintiff should have been more careful to provide this information in its complaint, the plaintiff's counsel has represented to the Court that the Citizens' Group does include involuntarily committed patients at Manhattan State who are otherwise qualified to vote and, indeed, who plan to vote in the 1981 election if the Court grants the relief sought by the plaintiff. The plaintiff is directed to provide the names and pertinent backgrounds of some of these individuals to ensure that the Court has jurisdiction to hear this matter.

II. Statutory Background

Section 5-106(6) of the New York Election Law provides that
[n]o person who has been adjudged incompetent or committed to an institution for the mentally ill by order of a court of competent judicial authority shall have the right to register for or vote at any election in this state unless thereafter he shall have been adjudged competent or released from such institution pursuant to law.
N.Y. Election Law § 5-106(6) (McKinney 1978). Although this is a seemingly simple statutory provision, a few comments are necessary to place this case into proper focus. First, persons who commit themselves voluntarily and persons involuntarily committed *1272 by means other than court order retain their right to vote. Second, the plaintiff does not challenge that aspect of the statute that excludes persons adjudged incompetent from voting. As will be discussed below, competency proceedings are quite different from commitment proceedings.

a. Commitment Proceedings

Article 9 of the New York Mental Hygiene Law[1] sets forth the methods by which a mentally ill person can be admitted to a hospital[2] as an in-patient. There are generally four admission classifications: informal admissions, voluntary admissions, involuntary admissions on medical certification, and emergency admissions for immediate observation, care and treatment.[3] Depending upon the admission procedure that has been used in a particular case, the hospital must at some point apply for a court order if it is to retain the patient on an involuntary basis.[4]
The standard for granting court authorization to retain an involuntary patient is whether the court is "satisfied that the patient requires continued retention for care and treatment." N.Y. Mental Hyg. Law § 9.33 (McKinney 1978) ("MHL § 9.33"). Although this standard seems somewhat vague, when MHL § 9.33 is read in conjunction with the definitional section, MHL § 9.01, it becomes quite clear. For example, the phrase, "need for retention" means "that a person who has been admitted to a hospital ... is in need of involuntary care and treatment in a hospital for a further period." MHL § 9.01 (emphasis added). The phrase, "in need of involuntary care and treatment" is defined as a person having a mental illness "for which *1273 care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he is unable to understand the need for such care and treatment." Id. (emphasis added). The phrase "in need of care and treatment" is defined as a person having a mental illness "for which in-patient care and treatment in a hospital is appropriate." Id. When read together, these various definitions create the following standard for court authorized retention: the person to be committed must have a mental illness for which care and treatment in a hospital is essential to such person's welfare and, in addition, the person's judgment must be so impaired that he is unable to understand that he has a mental illness for which in-patient care and treatment in a hospital is appropriate.

b. Competency Proceedings

Commitment proceedings should not be confused with competency proceedings.[5]See Winters v. Miller, 446 F.2d 65, 68 (2d Cir.), cert. denied, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971); Gurland v. Beckenstein, 286 A.D. 704, 146 N.Y.S.2d 830 (2d Dep't), appeal denied, 309 N.Y. 969, 132 N.E.2d 331 (1955). Section 29.03 of the MHL provides that an order authorizing retention of a patient shall not "be construed or deemed to be a determination or finding that such person is incompetent or is unable adequately to conduct his personal or business affairs." Thus, absent a judgment of incompetency, an involuntarily committed patient retains the right to marry, draft a will, sue in his own name, and generally manage his affairs.[6]Winters v. Miller, supra, 446 F.2d at 68; Sengstack v. Sengstack, 4 N.Y.2d 502, 176 N.Y.S.2d 337, 151 N.E.2d 887 (1958); Neely v. Hogan, 62 Misc.2d 1056, 310 N.Y.S.2d 63 (1970).
Competency proceedings concern one's ability to conduct one's personal or business affairs. When it is determined that one is "incompetent" to manage one's affairs or property, or, in the case of a patient, "unable adequately to conduct his personal or business affairs,"[7] the court appoints a committee to provide for the care of the incompetent and manage his affairs.[8] MHL § 78.01. The only similarity between one who has been adjudged incompetent *1274 and one who has been involuntarily committed by court order is that both lose their right to vote. See N.Y. Election Law § 5-106(6) (McKinney 1978).

III. Constitutionality of Section 5-106(6)

Turning our attention to the constitutionality of section 5-106(6), we are confronted with a statute that infringes upon the exercise of a fundamental rightthe right to vote. Consequently, to justify these restrictions, the state must meet the difficult burden of proving that they are narrowly tailored to promote a compelling state interest. Dunn v. Blumstein, 405 U.S. 330, 337, 92 S.Ct. 995, 1000, 31 L.Ed.2d 274 (1971); Kramer v. Union Free School District No. 15, 395 U.S. 621, 627, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969). This it has not done.
The state alleges that it has an interest in assuring that electoral choices will be made by intelligent and interested voters. Assuming that this constitutes a compelling state interest,[9] the statute is, nevertheless, constitutionally defective because it is not narrowly tailored to effectuate that interest. Because the statute restricts the voting rights of persons involuntarily committed to hospitals by court order, as well as judicially declared incompetents, the statute disenfranchises individuals who might be capable of making rational voting choices.
When one is declared incompetent, the court has found that person unable to conduct any of his personal or business affairs. Presumably, this includes the ability to cast a rational vote. One who has merely been committed, however, is in quite a different position.[10] The principal issue in a commitment *1275 proceeding is a medical one: does the person to be committed have a mental illness for which hospitalization is essential and is the person's judgment so impaired that he does not understand his need for hospitalization. A finding that a person lacks understanding about his mental illness and need for hospitalization is not determinative of his ability to vote intelligently. For example, consider the situation of a brilliant political science professor who is so depressed that he is on the brink of suicide. Contrary to the advice of his friends and family, the professor refuses treatment for his depression. If two physicians certify that he is in need of involuntary care and treatment, he can be held on an involuntary basis for up to sixty days. If, after the sixty day period elapses, the professor still refuses treatment, he may continue to be retained if a court determines that his judgment is so impaired that he does not understand the need for such care and treatment. Such a determination by a court would not necessarily bear on the professor's ability to make rational, if not brilliant, voting decisions. Consequently, because the statute does not meet the "exacting standard of precision" required of statutes that restrict the right to vote, Kramer v. Union Free School District No. 15, supra, 395 U.S. at 632, 89 S.Ct. at 1892, it is unconstitutional, but only as applied to persons involuntarily committed to hospitals by court order who have not been adjudged incompetent.[11]

IV. Motion for Preliminary Injunction

Ironically, the most difficult aspect of this case is not in deciding the substantive constitutional issue, but in deciding whether preliminary injunctive relief should issue in light of the plaintiff's delay in instituting this action. The standard requirements for issuing a preliminary injunction are "possible irreparable injury and either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc., 601 F.2d 48, 54 (2d Cir. 1979) (quoting Caulfield v. Board of Education of the City of New York, 583 F.2d 605, 610 (2d Cir. 1978) (emphasis in original)). See also Triebwasser & Katz v. American Telephone & Telegraph Co., 535 F.2d 1356, 1358 (2d Cir. 1976). As indicated above, the plaintiff has demonstrated probability of success on the merits. The second requirement, irreparable injury, poses more serious problems.
For purposes of issuing injunctions, deprivations of constitutional rights are generally considered to constitute irreparable injury. International Association of Firefighters v. City of Sylacauga, 436 F.Supp. 482, 492 (N.D.Ala.1977). There is also authority, however, that an unjustified delay in seeking a preliminary injunction militates against the claim of irreparable injury and may be ground for barring injunctive relief. Continental Oil Co. v. Crutcher, 434 F.Supp. 464, 471-72 (D.La. 1977); Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc., 335 F.Supp. 278, 280-81 (S.D.N.Y.1971). An exhibit attached to plaintiff's reply papers indicates that the plaintiff's counsel knew of the statutory exclusion of involuntarily committed patients as early as May, 1980. See Letter from Paul White to Minna Kotlin (May 6, *1276 1980), reprinted in Plaintiff's Reply Memorandum at Exhibit A. The plaintiff, however, did not file this action until just ten days, excluding weekends and holidays, before the close of the voter registration period. The only justification presented for this fifteen month delay is that plaintiff's counsel is "`at a loss to guess at what time' this motion would be more appropriate." Plaintiff's Reply Memorandum at 4 (quoting Herron v. Koch, 523 F.Supp. 167 (S.D.N. Y.1981)). Plaintiff's counsel apparently fails to recognize that the need for preliminary injunctive relief could have been obviated entirely if this action had simply been commenced earlier. It is an unfair imposition on the defendants and on the Court to force an unnecessarily hasty decision on such an important question of constitutional law.
A similar situation occurred in United States v. State of Texas, 422 F.Supp. 917 (1976). In that case, the plaintiff filed suit just nineteen days before the general election, challenging the constitutionality of the registration procedures for students attending college in the county. A three-judge court dismissed the motion for a preliminary injunction because of the delay in filing the action. Similarly, we feel justified in denying the plaintiff's motion for preliminary injunction entirely because of the delay in commencing this action. Because of the great weight that society places on the right to vote, and in light of our conclusion that the statute is indeed unconstitutional, the Court has nevertheless determined that some equitable relief is warranted, at least to the extent that such relief does not disrupt the orderly conduct of the elections next week.[12]See United States v. State of Texas, supra, 422 F.Supp. at 924.
Because the registration date for the 1981 election has already passed, the only relief that can be granted at this juncture is to permit those patients who are already registered to vote by absentee ballot as provided by Election Law § 8-400.[13] To limit the confusion that will inevitably occur, the Court shall require the plaintiff's counsel to personally deliver the appropriate applications to the board of elections. If the board of elections deems the applicant otherwise qualified to vote, it shall issue an absentee ballot to the plaintiff's counsel who, in turn, shall have the responsibility of making certain that the patient receives the ballot and that the board of elections receives the completed ballot within the prescribed time.[14]
The Court does not want this situation to recur next election. Accordingly, the parties are directed to prosecute this case actively and to bring the litigation to a conclusion well before the close of the next voter registration period.
SO ORDERED.
NOTES
[1] The New York Mental Health Act, codified in the Mental Hygiene Law, is a lengthy statute that sets forth various programs and procedures designed for the care, treatment, and rehabilitation of the mentally ill citizens of New York. N.Y. Mental Hyg. Law § 7.01 (McKinney 1978) ("MHL § 7.01").
[2] The statute defines hospital as

the in-patient services of a psychiatric center under the jurisdiction of the office of mental health or other psychiatric in-patient facility in the department, a psychiatric in-patient facility maintained by a political subdivision of the state for the care or treatment of the mentally ill, a ward, wing, unit, or other part of a hospital, as defined in article twenty-eight of the public health law, operated as a part of such hospital for the purpose of providing services for the mentally ill pursuant to an operating certificate issued by the commissioner of mental health, or other facility providing in-patient care or treatment of the mentally ill which has been issued an operating certificate by such commissioner.
MHL § 1.03(10). We use the term hospital in the same context.
[3] In an informal admission, the hospital admits a patient requesting admission without any formal or written application and on the condition that the patient can discharge himself from the hospital at any time after admission. MHL § 9.15. A voluntary admission also occurs at the request of the patient, but requires a written application. MHL § 9.13(a). If the voluntary patient notifies the director of the hospital in writing of his desire to leave the hospital, the director must release him. If the director believes that the patient is in need of involuntary retention, however, the director can retain the patient for up to seventy-two hours while applying for a court order authorizing the involuntary retention of the patient. MHL § 9.13(b).

An involuntary admission upon medical certification requires two examining physicians to certify that the person is "in need of involuntary care and treatment." MHL § 9.27(a). A commitment by medical certification extends commitment for sixty days, during which no court order is required, and thus, no disenfranchisement occurs. After the sixty day period expires, the director of the hospital must apply for a court order authorizing retention to retain the patient on an involuntary basis. MHL § 9.33(a).
The emergency admission procedure permits the hospital to retain for fifteen days "any person alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others." MHL § 9.39(a). If, after fifteen days, the hospital seeks to retain the patient, it must admit the patient through medical certification procedures described above. MHL § 9.39. Thus, under the emergency admission procedure, the hospital is not required to obtain a court order authorizing retention for a total period of seventy-five days. A patient may also seek judicial review by applying for a writ of habeas corpus. MHL § 33.15.
[4] See note 3 supra.
[5] It appears that some New York courts do not perceive much distinction between competency proceedings and commitment proceedings. See, e. g., Application of Weingarten, 94 Misc.2d 788, 405 N.Y.S.2d 605 (Ct.Cl.1978); Young v. State Department of Social Services, 92 Misc.2d 795, 401 N.Y.S.2d 955 (Ct.Cl.1978); Matter of Vance A, 105 Misc.2d 254, 266 n.19, 432 N.Y.S.2d 137, 145 n.19 (Fam.Ct.1980).
[6] These transactions, however, might be voidable. See, e. g., Squeri v. Squeri, 57 Misc.2d 508, 293 N.Y.S.2d 234 (S.Ct.1968).
[7] Section 78.01 of the MHL gives the New York courts jurisdiction over the custody and property of a person if "he is incompetent to manage himself or his affairs by reason of age, drunkness, mental illness, or other cause, or is a patient ... who is unable adequately to conduct his personal or business affairs." Section 78.03 of the MHL sets out the procedures for competency proceedings generally. Section 78.07 sets out the procedures relative to patients of state facilities. The statute does not indicate why separate procedures are used for patients in state facilities. The Court expresses no comment on the constitutionality of these procedures since the plaintiff does not challenge that section of the election law that excludes adjudged incompetents.
[8] New York has two separate remedies for persons whose ability to conduct business and personal affairs has become totally or substantially impaired: the conservatorship and the committee. If it is determined that one "has suffered substantial impairment of his ability to care for his property," the court may appoint a conservator to manage the conservatee's property. MHL § 77.01 (emphasis added). Appointment of a conservator does not affect one's right to register or vote in New York elections. MHL § 77.25. Committees are appointed to manage the affairs of those declared incompetent. MHL § 78.01. Because of the social and legal stigma attached to being declared incompetent, the law prefers the appointment of conservators to the appointment of committees. Matter of Seronde, 99 Misc.2d 485, 416 N.Y.S.2d 716 (S.Ct.1979); MHL § 78.02. Indeed, the statute requires the court to make a determination that a conservatorship is not appropriate before it may make a declaration of incompetency and appoint a committee. MHL § 78.02.
[9] The plaintiff makes three arguments against the contention that the state has a compelling interest in having a rational electorate. First, it argues that Congress and the courts have rejected such an argument in enacting and upholding legislation prohibiting literacy tests. Literacy and mental illness, however, present different considerations. The ability to read does not necessarily bear on the ability to vote rationally. Mental illness often affects the ability to comprehend and make rational choices. Second, it argues that studies of the voting patterns of mental patients at Bronx State Hospital reveal a similarity to that of the "normal" voter. See Plaintiff's Memorandum at 11 (citing Klein & Grossman, Voting Competence and Mental Illness, 3 Proc. 76th Ann. Convention Am. Psychological Ass'n 701, 702 (1978); Klein & Grossman, Voting Pattern of Mental Patients in a Community State Hospital, 3 Community Health J. 149, 152 (Summer, 1967)). The relevance of this study, however, is not in determining whether the state has a compelling interest in having a rational electorate, but in determining whether the exclusion of mentally ill citizens is necessary to promote that interest. The third and final argument is that the fact that ten states do not disenfranchise the institutionalized mentally ill casts doubt on the compelling nature of the state's interest. This too bears on the necessity of the exclusion rather than on whether the state has a compelling state interest. Moreover, the converse of this argument, that 80% of the states do disenfranchise the institutionalized mentally ill, supports the defendants' argument that the statute is necessary.
[10] The defendant has proffered the argument that one who has been involuntarily committed is presumptively incompetent. The case law is inconsistent on this point. Some of the cases hold that commitment to a hospital does create a presumption of incompetency. See, e. g., Boland v. State of New York, 30 N.Y.2d 337, 342, 333 N.Y.S.2d 410, 414, 284 N.E.2d 569 (1972) (quoting with approval, Carmody-Wait, 2d, Actions in the Court of Claims, § 120.17, at 748); Application of Carter, 72 N.Y.S.2d 666 (S.Ct.1947). Others hold that a finding of mental illness creates no presumption of incompetency. See, e. g., Winters v. Miller, supra, 446 F.2d 65; Hoff v. State of New York, 279 N.Y. 490, 18 N.E.2d 671 (1939); Finch v. Goldstein, 245 N.Y. 300, 157 N.E. 146 (1927); People ex rel. Flagg v. Lengyel, 19 A.D.2d 834, 244 N.Y. S.2d 519 (2d Dep't 1963). The reason for this inconsistency is that the New York courts draw distinctions between the type and degrees of mental incapacity, depending upon the particular issue involved. Young v. State Department of Social Services, 92 Misc.2d 795, 797, 401 N.Y.S.2d 955, 957 (Ct.Cl.1978). The 1972 Mental Hygiene Law, 1972 N.Y. Laws c. 251, clarifies this inconsistency and states definitively that "[n]o order or determination ... that a person is in need of involuntary care and treatment or that there was a need for retention of such person shall be construed or deemed to be a determination or finding that such person is incompetent or is unable adequately to conduct his personal or business affairs." MHL § 29.03. Thus, the defendant's argument is without merit.
[11] The plaintiff also argues that the statute violates the equal protection clause because it is underinclusive in that it does not exclude persons who commit themselves voluntarily and persons involuntarily committed by means other than court order. The plaintiffs argue, in effect, that, assuming the state has a compelling interest in a rational electorate, the state may disenfranchise mentally ill persons only if it disenfranchises all mentally ill persons. Although this raises interesting constitutional questions, see L. Tribe, American Constitutional Law § 16-4 (1978), they need not be resolved on this motion. We do note, however, that there seems to be justification for distinguishing between those committed by court order and those committed by other meansdisenfranchisement without the benefit of judicial review would certainly violate the due process clause.
[12] In so doing, we are cognizant of the reluctance of federal courts to disrupt the orderly conduct of an impending election. United States v. State of Texas, 422 F.Supp. 917, 924 (S.D.Tex.1976). We also note that no suggestion has been made that the Court should abstain from deciding this issue until the state courts have had an opportunity to hear the matter.
[13] The plaintiff also seeks an injunction directing the defendants to inform all persons charged with enforcing section 5-106(6) and all court-committed persons that the statute is void and without effect. This relief will not be granted at this time.
[14] The Court is reluctant to grant this relief while the question of the plaintiff's standing to prosecute this action remains in flux. By taking the steps to implement this relief, however, plaintiff will have established the requisite standing to maintain this action. See Part I, supra.